I'm William J.T. Brown representing the Plaintiff Appellate, Joan Brown Kearney. This is a case, it's kind of a sad case because it was here six years ago and the court reversed the dismissal. It was a dismissal on 12 v. 6 grounds. It's been dismissed again, so we come back to this court. The case is a case of fraud on the court. It's a case where... Let me ask you this, and I don't know, I know practically nothing about RICO. Happily, I've had almost no exposure to RICO. But your contention is that they began a conspiracy to deprive your client of fair compensation for a property and that that constitutes, I gather, a criminal act and that it continued at least through November of whatever. My question is, well, if that's so, then aren't further predicate acts... Haven't they been committed every time they fought against you in the state courts with every filing that they made to try to maintain, to keep that PERC test out of court? My point is, did the predicate acts really end, from your perception, and they'll have a different one, I'm sure, with the... The predicate acts are alleged in the complaint. They're massive. They are lots of use. But what about fighting you hammer and tong in the state courts and successfully so? Well, that was the RICO violation. Okay. They approached... This is a case of a Mrs. Kearney who had a 50-acre parcel. She wanted to develop it as a housing unit, housing subdivision. With her father, he died. She proceeded with the property. And the Foley and Lardner prominent national firm approached her and said, we want to buy this for the Ramona Unified School District. And first they broke into her property. I don't say the Foley and Lardner people broke into the property. Some people acting for the school district came in there. They were found to be digging holes, testing the property. Why don't you just lift the microphone? I could lift it up, see. A little higher. Speak for it. They were digging holes. This was revealed. There were further... They refused to give samples of what they were doing. They finally... I think we understand that. And your time is short. And a lot of issues. Maybe jump into your arguments, please. 590, this court found that there was a... of fraudulent activity. That the proceedings were entirely deprived of their legitimacy. And that was in the prior holding of the court. 590 F. 3rd. And as a result, it was held by this court that the Knorr-Pennington Doctrine did not grant any kind of immunity to what the defendants did in the legal proceedings. And the court then reinstated Mrs. Curdy's complaint. Sent it back to the district court. It went to the district court. The two claims she has are a 1983 claim, the use of government power by these individual lawyers and the school administrator to take away her constitutional rights to clear compensation for her property. And also the RICO violation to the same end. The judge who sat on the case for a number of years, Judge Lorenz, ruled that the RICO requirement of continuity and pattern were fulfilled. He... Say that again. He ruled that the RICO requirement of continuity and a pattern, that the completing requirements were fulfilled. He... On a 12B6 motion that had been pending for years, he did grant that and kicked out the 1983 claim. Then a new judge came into the case, Judge Battaglia, and he, seemingly unaware, not realizing that the RICO pattern and continuity requirements that the previous judge had ruled that they were fulfilled, he found that they hadn't been fulfilled. And that they weren't fulfilled and he dismissed with prejudice. So after six years, we're back before this court. Okay. Assume for the moment that I disagree with you that that's the law of the case, Judge Lorenz's opinions, and anything this court said before in the earlier appeal. How have you... How does your present complaint satisfy that element? And that's the issue, isn't it? Well, Your Honor, we're not claiming that the law of the case would bar the judge from changing his mind and proceeding to the law. We think on the merits... That's what I want to hear. We think on the merits. Continuity, two years. A two-year closed-end continuity. Judge Battaglia said that you can't have any kind of closed-end continuity. He read it out of the statute, even though the H.J. case in the Supreme Court and numerous other cases, even the case that we've just received from Mr. Carilli a few days ago, the Wilmersburg case, that recognizes that the closed-end continuity is... That's a continuity. The procedures that are used to cause harm may terminate, but the fact that they've terminated doesn't mean that they didn't have continuity. If they lasted a substantial period of time. Yes, and in the case supplied by Mr. Carilli, it says it has to be over a year. Here, Your Honor, we've got two or three years. So we think those cases really support the idea that we have adequate continuity. So we feel that that should be reversed on the continuity grounds and on the pattern grounds. The pattern... Look at the pattern here. The pattern was so great that this court found that Norr Pennington was defeated. The Norr Pennington defense says, Oh, you have a procedure before the courts. You're petitioning the court. That's a First Amendment right to do that. That's good. When the court said... And it was an opinion by Judge Ezra. I think, Your Honor, Judge Prayerson participated in the opinion. It found that the pattern was so pervasive, and it was denied... This is a housing development. We want to know how many houses can we build on the development, and we can find that out by looking at the PERC tests. How many houses can be built there? How many sewage systems? And this was denied. It was denied before the proceedings of condemnation began. It was concealed during the condemnation proceedings, and afterward, these documents showing that it could have taken 20 or 30 houses. And the documents showing that were concealed, and it was surrendered only after the district court had lost jurisdiction, the California state court had lost jurisdiction, due to the taking of an appeal, which had to be taken because the time was running out. So this was pursued through the state courts. Mrs. Kearney and her then-counsel did the best they could to try to get relief from the state courts, and we feel that there's a severe error below in kicking out the 1983 claim as time-barred because it was commenced within a year and a half of completion of the proceedings in the state courts. And I think the case is a Williamson County case in the Supreme Court. It says if you're complaining that you didn't receive a fair price for your property, your cause of action accrues when the procedures to determine the fair price have reached their conclusion. And that happened within the statutory period. It's kind of an exhaustion of remedies notion. Yes, it is. The Fifth Amendment right to compensation for your property is different from the right not to be thrown in jail unconstitutionally. If I'm beat up or burned or harmed in violation of the Constitution, my right accrues immediately. If my property is taken, the Constitutional right accrues only when the fair compensation is denied. You have to go through a procedure. You do the whole procedure like, oh, let's determine this, and if you don't like it, the state affords you different remedies, and you have to follow that through. The Sinaloa Lake case, decision by this court, and the Williamson County case, Supreme Court explained this concept. And Judge Lorenz was just wrong on that point. And then the other error we complain of is the RICO dismissal. Let me back up to this. Something just occurred to me. I mean, if I understand your argument, look, if we had filed sooner, we would have been subjected to a couple of challenges, perhaps one that was premature that wasn't ripe. And in any event, we would have to fight a two-front war in two separate jurisdictions, possibly, perhaps potentially, with courts reaching contrary decisions. Well, that's absolutely right. I doubt if you could go and say, I've been deprived of my constitutional right to just compensation, because I think this court would say, well, wait until you find out what happens when you complete the proceedings. You're premature to come here. That's what the Supreme Court said in Williamson County. Could there have been a risk of inconsistent outcomes in the California court and in the federal court? It just occurs to me right now. I don't know. I think the courts would struggle to avoid inconsistency in that. I think the federal judge would say, go away. Complete your proceedings in the state court. Maybe things aren't going to be so bad. But then on the RICO point, I just want to point out, there is a basic inconsistency here. I don't know if it's an inconsistency, but this court found that the proceedings, the condemnation proceedings, were so infected with fraud that the usual Norr-Pennington doctrine that says, hey, you can petition the court. It's okay. A little lie here, a little lie there, a little something regrettable, but it doesn't take away the legitimacy of the proceedings. But this court found that here the violation was so severe that the entire fabric of legitimacy was gone. And the court found in particular, I'm going to refer you to a footnote in the court's decision. It said that these were not isolated incidents. Sometimes you say this isn't a pattern in RICO because isolated incidents, things happen here, regrettable, but not a pattern. That was dicta, wasn't it? Or was it? I don't think so because I think it was part of the decision that Norr-Pennington did not apply. And Norr-Pennington, it's a big thing. It's a constitutional right. It's changed a lot since I was a law student. It used to relate only to antitrust communities. But now it's much broader, and this court said it didn't apply. So we feel this is a sad case. Here we are six years after our previous appearance here. It wasn't by me. It was an excellent prior counsel. We think that there were a number of 12b-6 motions filed back in 2005, RICO, statute of limitations, the Norr-Pennington immunity claim, and it's possibly, we could say it's questionable practice for the district court not to decide all of these motions. Decide one, kick it out, go to the Court of Appeals, reinstate it, come back, decide another one, kick it out again. Here we are. We're complaining about property that was taken and not paid for a proper amount back in 2000, and here we are 15 years later. It's possibly not such good practice, and we should really try to find a way to ensure that this type of motion is decided promptly and together so that we don't have yet another one coming up. So at this point I ask the court to hold that the fact that the, and I think this is a matter of law of the case, the decision by this court was that the pattern of fraud was so pervasive that it violated Norr-Pennington. That is law of the case. That means it was very pervasive, a very pervasive pattern of misconduct. Withholding those perk tests, starting by going on the land illegally, breaking a fence, going through the entire proceeding, telling the jury no perk tests, we don't know, holding on to them after the trial was over, eventually surrendering them only when it was too late to do anything with them. We think that's all a very, very serious thing, and that is law of the case, and there should be consequences. And a consequence is that not only did that defeat the normal privilege of Norr-Pennington, but it also is a RICO kind of a thing. I also want to point out that the judge below erred in saying that since Mrs. Kearney was a single individual, a single victim, that he felt that RICO should not protect single victims. Well, who knows how many people have been a victim of this kind of greedy type of procedure, bare knuckle, where you go after a landowner, try and show your skill as a counsel to get the property cheap. And so that is not a strong thing. In this circuit, in the leading case of Sun Savings, it was held that that was a single victim. A single victim, there are bad people who operate one victim at a time. And here, more important is the fact that this would have been a housing development by Mrs. Kearney, housing development which would have involved homes for 20 or 30 families. So they suffered, too. I'm not saying that there are additional plaintiffs, but in judging whether this is really a kind of a RICO type thing, we have to look at the commerce that's involved, the weight of a school versus a housing development. This is a RICO type thing. It isn't, as in the Fujisawa case, where Judge Posner expressed his opinions, it isn't a little old lady knitting in the parlor. It is a matter of major commercial dealings. Thank you. Thank you. Thank you. May it please the Court, Benjamin Fox appearing for the Foley and Lardner Law Firm and its partners, Mr. Moser and Mr. Marshall. Let me address RICO first. There is no pattern of racketeering activity because there is no threat of ongoing criminal activity in this case. There is a single alleged fraud, a single victim, a single piece of property, and a single condemnation proceeding below. That is the focus of this case. That's not RICO. The law of the case does not apply here. The prior opinion from this Court addressed only the Knorr-Pennington Doctrine. The instructions from this Court to the District Court on remand were to consider plaintiff's claims, and the District Court did that through three further amendments, ending with the fourth amended complaint. The statute of limitations issue. The rule on statute of limitations is that the statute begins to run when a plaintiff has reason to know she has suffered an injury. Here, the injury caused by the law firm or its partners, if any, was the withholding of the percolation test results. She knew of that injury by at least May 2002. The two-year statute ran. Unless the Court has questions, I will cede my time. What about the questions I asked? Was the injury full and complete as of that instance? Or the effect of that misconduct not in a final and dispositive way being determined to have caused injury until the California Supreme Court closed the door firmly and finally on any chance of getting that document before the trial court? The injury giving rise to the claim as against the law firm partners was full and complete as of their alleged misrepresentation, and as of the time the plaintiff had knowledge or reason to know that it was a misrepresentation. In other words, the concealment itself, the delayed disclosure, okay, let's call it that, that was injury. Yes, Your Honor, if there is any injury in this case. I'm sorry, I don't quite follow that because, you know, the misconduct alleged is untimely disclosure of a document that should have been produced sooner. Whether that has any significance or consequence cannot be known with any certainty, it seems to me, in this situation until she finds out and her lawyer finds out whether we can go back to square one or close to it and get the court to look at it and to reconsider what it's done. I mean, otherwise it's, I don't see how it's affected her in an adverse and significant sort of way. I really don't. Yes, I understand. That's why I'm asking the question. Point. The answer is that the injury, if there was one, let me put it this way. The lawyers did not take the plaintiff's property. If there was a taking, it was by the school district. So to have a claim against the lawyers, you need to rely on the concealment. That's why this case, we think, is more like Bagley as against the wardens and not like Williamson. But the allegations, if I recall correctly, encompass a conspiracy and so if the school board is not deemed to have affected an injury until the state court avenues for relief were finally closed, why doesn't that apply to your clients as, again, in the terms of the complaint, co-conspirators? Therefore, the statute, I gather you're saying, did not run as to the school board until the state proceedings had come to an end. What carves your clients out in that situation? Well, I don't believe the claim as pleaded even involved the school board, as I recall it. I believe the second claim, and it's in the second amended complaint, is only against the three individuals, my two law firm partner clients and the business manager. I think that's the best I can do today. But as to him, when did the statute run? I believe he is a third party. Mr. McCarty's counsel may need to answer that, but I believe that he is in the same situation as the Foley and Lardner partners.  Thank you, Your Honors. Good. Thank you. Thank you, Your Honors. Paul Corelli appearing on behalf of Dr. Michael McCarty. And let me start with Your Honors' question, which is, as I understand it, when did the injury accrue? Right. The injury accrued at the time that all of the predicate knowledge was there, or in Ms. Kearney's hands. At the time that she received the tests, she learned about the tests, that she understood the ramifications of those tests, and arguably to the point where the judge said those tests, in this case, don't help you in this matter. So that's where all of her injury had accrued. She could then have said, you know what? Dr. McCarty has unfairly withheld these test results, and she could have brought her actions in the federal court. And to answer your other question that you had asked earlier about, well, you've got two actions going on. Then you've got the state court action. The two-front war, which is, as I understand the case law that's been cited in this case, the Ninth Circuit has required in the federal case that the plaintiff there just ask for a stay, let the state court actions continue until their end, and then they can lift the stay if there's something that's going to change the circumstances. So under the circumstances here, as alleged, Dr. McCarty, it's alleged, had his deposition taken in October of 2001, said that there were tests. They went all through this trial. Dr. McCarty is not alleged to have testified during the trial. The judge then made a decision after these tests were released and said specifically, and his findings were upheld by the California Court of Appeal, that the attorney at the time for Ms. Kearney, who was conducting the trial, didn't want to see those particular tests, and the reason that they had made a tactical decision to do that, and he said that very specifically on the record, Your Honor. So in terms of the timeline, that's where Dr. McCarty's position is. I'm happy to answer any other questions. If not, we will submit. Thank you, Your Honor. Thank you. Can I have a moment, please? Sure. This is completely incorrect. Obviously, Judge Dufillier, at the close of the proceedings, said, I devoted a lot of time to this, I'm not anxious to reopen things. He did not have, even he did not have the PERC test results. The order was given by Ramona School people not to write up reports about the PERC test results. We finally got, after everything was over, we finally got a raw map with small data, which indicated the number of homes that could be built there, but it had to be interpreted by experts. So this is, this court has found that this was a, we're talking about allegations. We have allegations of a pervasive scheme here that started before the condemnation proceedings, continued throughout, continued afterward. So we feel this is a very serious matter, and the court should allow us to go to trial on it, to have a discovery and go to trial. So who got the benefit of all this, the school district? Pardon? Who got the benefit of this conduct? I think that the lawyers got a benefit. They were able to say, hey, we did a great, we got you something very cheap. We're good at this. We're hard knuckled. The Los Angeles v. Decker case in California says counsel in eminent domain who are working for the public authority should be honest, open, and above board, impartial. Here we are dealing with a firm that was acting very tough and was able to get good results. Same for Mr. McCarty, the school board administrator who was busy acquiring property for the school. Hey, I got it for you cheap. I did a great job. The conspiracy individuals all profit in their professional situation, and that's the temptation to do this type of thing. So did they get any bonuses or anything like that? We don't know. We haven't had discovery. But clearly they got a lot of legal fees. They got a reputation. We're a great national law firm out of Milwaukee with offices throughout California. Well, I'm not sure that's all part of the record. I withdraw it then, Your Honor. Thank you. Thank you. Thank you. This concludes our session for this week, and we stand adjourned.
judges: Carr, Pregerson, Nguyen